O’MALLEY, Circuit Judge,
concurring in the result.
I concur in the result the majority reaches today, but not with the entirety of its rationale therefor. I agree with the analysis in Section II of the Discussion section of the majority opinion. That is, I agree that, assuming the Ex Post Facto Clause of the U.S. Constitution is implicated by passage of § 1(b) of Pub.L. No. 112-99, 126 Stat. 265 (2012) (the “Act”), the legal consequences imposed on the activities identified therein are not sufficiently punitive to violate the Ex Post Facto Clause. I do not agree, however, that the Ex Post Facto Clause is necessarily implicated by the Act. And, I disagree that any binding precedent of this court forces us to conclude that it is. For these reasons, I write separately.
I believe we should either conclude that, assuming the Ex Post Facto Clause is implicated, it has not been violated by passage of the Act or should decide as a panel whether the Act was actually restorative, doing so anew. The government argues that the Ex Post Facto Clause was not implicated by passage of the Act because the Act did not have the effect of attaching “new legal consequences to events completed before [the statute’s] enactment.” Landgraf v. USI Film Prods., 511 U.S. 244, 266, 269-70, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). It asserts that, because the Act did no more than reaffirm the state of the law prior to the Act (i.e., that Commerce always had the authority to impose countervailing duties upon goods imported from nonmarket economy countries in those instances where it was able to identify a net countervailable subsidy), we need not determine whether § 1(b) is remedial or punitive in nature. While the government concedes that we held in GPX International Tire Corp. v. United States, 666 F.3d 732 (Fed.Cir.2011) (“GPX I”), that Commerce did not have the authority to impose countervailing duties on such countries, including China, as of the date GPX I was decided, the government argues that our decision was mistaken and that Congress has now made that fact clear.
As we conceded in GPX International Tire Corp. v. United States, 678 F.3d 1308 (Fed.Cir.2012) (“GPX II”), Congress passed the Act to prevent our decision in GPX I, from becoming law, and did so because it believed GPX I did not accurately describe the state of the law at the time it was issued. As we noted:
Having reviewed the briefs submitted by the parties, two things are clear from *1210 the new legislation. First, Congress clearly sought to overrule our decision in GPX [I], The language of section 1(b) is clear in this respect. Moreover, during the floor debate, our decision in GPX [I] was referenced by name and discussed at length. One of the bill’s sponsors specifically noted that the new legislation “overturns an erroneous decision by the Federal circuit [sic] that the Department of Commerce does not have the authority to apply these countervailing duty rules to nonmarket economies.” 158 Cong. Rec. H1167 (daily ed. Mar. 6, 2012) (statement of Rep. Dave Camp).
GPX II, 678 F.3d at 1811. We also observed that the new legislation makes clear “that Commerce’s imposition of both countervailing duties and antidumping duties on NME countries under ‘pre-existing law1 ” (i.e., the law in place before GPX I issued) did not amount to “ ‘unreasonable’ double counting.” Id. at 1312 n. 3. Finally, we found in GPX II that Congress had the authority to prevent this Court’s decision in GPX I from becoming a final judgment. Id. at 1312. Indeed, we acknowledged that the Act prevented issuance of a mandate that would have put into effect this Court’s then-belief that, under pre-existing law, Congress did not intend to allow Commerce to impose both countervailing and anti-dumping duties on nonmarket economy countries, including China. Id. And, no such mandate ever issued.
Because Congress could and did prevent GPX I from ever becoming a final judgment, I cannot agree with the majority that GPX I “still stands as a statement of the law at the time of its decision.” Maj. Op. at 1202. Id. GPX I never became a judgment of this Court and should not be treated as if it did. The fact that we did not vacate the opinion does not give that opinion the force of law or make it prece-dential.
Because GPX I never became law, the only way the Ex Post Facto Clause could be implicated is if we were to decide today, as a newly constituted panel, that the holding in GPX I was correct — i.e., that Commerce did not have the authority to impose countervailing duties on non-market economy countries prior to passage of the Act.
While the decision in GPX I contained many persuasive arguments, it remains true that the exercise the panel there undertook was to determine whether Congress intended to exclude non-market economy countries from 19 U.S.C. § 1671 Section 1671 provides, without express exception, that, when a “government of a country” is providing a “countervailable subsidy” with respect to the production or exportation of specific merchandise, “there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net countervailable subsidy.” This unqualified language in the Tariff Act on its face appears to require Commerce to impose countervailing duties on all merchandise for which it identifies a countervaila-ble benefit, regardless of the country of origin. The issue in GPX I was whether this language not only permitted Commerce to refrain from imposing countervailing duties where evidence of a subsidy was lacking — as we found in Georgetown Steel Corp. v. United States, 801 F.2d 1308 (Fed.Cir.1986) — but actually prohibited Commerce from imposing countervailing duties where non-market economy countries were the ones supplying the otherwise countervailable subsidy.
While GPX I had, as noted, a variety of thoughtful rationales to support reading an unexpressed prohibition into the Tariff Act, Commerce is correct that, even at that time, there also were thoughtful arguments that counseled against that conclusion. Not the least of these arguments *1211 were the seemingly unequivocal language of the Tariff Act itself, and the fact that Commerce had been exercising what it viewed as its authority under the Act for many years, with Congress specifically allocating funds to Commerce to “defend” against both “antidumping and countervailing duty measures with respect to products of the People’s Republic of China,” a non-market economy country. 22 U.S.C. § 6943(a)(1); see also Consolidated Appropriations Act, 2010, Pub.L. No. Ill— 117, 123 Stat. 3034, 3113 (2009) (appropriating funds to the China Countervailing Duty Group at Commerce for fiscal year 2010). In addition, as the government argues, not only was there fair room for debate about whether Commerce was prohibited from imposing countervailing duties on China and other non-market economy countries at the time GPX I was decided, the landscape has evolved since then.
We now have a clear indication of whether Congress itself believes the Tariff Act meant something other than what it said on its face, and contained the implied prohibition the appellant urges here, and previously urged in GPX I. While not binding on us, we now know that Congress believes we misread its earlier silence when we decided GPX I.
As the United States points out in its brief: (1) Congress acted quickly to prevent GPX I from becoming a final judgment and, thus, having any force of law; (2) Congress changed the language of the statute to make clear that Commerce may — indeed must — impose countervailing duties unless countervailable subsidies are not discernible in a given non-market economy country (the circumstances at issue in Georgetown Steel Corp.); (3) the bill received almost unanimous support, despite its rapid pace; (4) those members of Congress who spoke on the floor about the bill emphasized that its purpose was to prevent GPX I from stripping Commerce of its ability to impose countervailing duties on non-market economy countries and to “reaffirm” that the countervailing duty laws apply to subsidies from China and other non-market economy countries; and (5) the legislative history is replete with references to legislators’ beliefs that our decision in GPX I was “based on a deeply flawed assessment of Congressional intent.” All of these facts indicate Congress’s belief that the Act was intended simply to reaffirm Commerce’s authority, an authority Congress believes “Commerce has always had” and believes Commerce should “continue to have and exercise ... in the future.” 158 Cong. Rec. H1166-67 (daily ed. March 6, 2012). This evidence is a congressional signal of what it believes its prior enactment authorized. I believe this expression of congressional intent should be considered when we determine whether — as the United States urges — the Act did not change the law; but merely confirmed it. Whatever the merits of the rationale employed in GPX I when it was originally decided, in light of all of the additional information available to us we may well not reach the same result today that the panel did in GPX I.
Because I believe the Act may not have changed the law and may only expose appellant to the same legal consequences it faced before passage of the Act, the Ex Post Facto Clause may not even come into play. I would either avoid this question, since it is not necessary to resolve the constitutional challenge before us, or address it directly and anew, in light of the entire and updated congressional record.